UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KARA MARINO,

                          Plaintiff,

                v.

THE STATE UNIVERSITY OF NEW YORK AT
  BUFFALO, and
STATE UNIVERSITY OF NEW YORK BOARD
  OF TRUSTEES,

                        Defendants.
_____

REPORT
and
RECOMMENDATION

23-CV-1064-JLS-LGF

APPEARANCES:        HACH ROSE SCHIRRIPA & CHEVERIE LLP
                           Attorneys for Plaintiff
                           HILLARY MARA NAPPI, of Counsel
                           112 Madison Avenue
                           10th Floor
                           New York, New York  10016

                           LETITIA A. JAMES
                           ATTORNEY GENERAL, STATE OF NEW YORK
                           Attorney for Defendants
                           DANIEL RYAN MAGUIRE
                           Assistant Attorney General, of Counsel
                           Main Place Tower
                           Suite 300A
                           350 Main Street
                           Buffalo, New York  14202

## <u>JURISDICTION</u>

      This case was referred to the undersigned by Honorable John L. Sinatra, Jr., on

December 4, 2023, for all pretrial matters including preparation of a report and

recommendation on dispositive motions. (Dkt. 8).  The matter is presently before the

court on Defendants' motion to dismiss (Dkt. 7), filed December 1, 2023.

## BACKGROUND

On October 9, 2023, Plaintiff Kara Marino ("Plaintiff"), commenced this action asserting claims against The State University of New York at Buffalo ("UB") and State University of New York Board of Trustees ("the Board") (together, "Defendants"), pursuant to Title IX of the United States Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), and New York common law.  Plaintiff alleges that Defendants' Title IX grievance program was deficient because it failed to address the prevalence of violence on UB's campus, thus creating an atmosphere where sexual assaults were more likely to occur, including the perpetrator's sexual assault on Plaintiff, and in the ensuing disciplinary hearing, UB failed to consider key evidence and its own definition of consent in finding the perpetrator's conduct did not violate UB's Student Code of Conduct.  Plaintiff asserts against both Defendants five claims for relief including (1) sex discrimination in violation of Title IX based on Defendants' unreasonable response to the assault, Complaint, First Cause of Action ("First Claim"); (2) sex discrimination in violation of Title IX based on Defendants' creation of a sexually hostile and abusive environment, *id*., Second Cause of Action ("Second Claim"); (2) breach of contract, *id*., Third Cause of Action ("Third Claim"); (4) negligent infliction of emotional distress, *id*., Fourth Cause of Action ("Fouth Claim"); and (5) negligence, *id*., Fifth Cause of Action ("Fifth Claim").[1]

On December 1, 2023, Defendants filed the instant motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim (Dkt. 7) ("Defendants' motion"), attaching Defendants' Memorandum of Law in Support of Their

---

[1] Plaintiff's First and Second Claims are collectively referred to as the "Title IX claims," and the Third, Fourth, and Fifth Claims are collectively referred to as the "State claims".

Motion to Dismiss (Dkt. 7-1) ("Defendants' Memorandum").  On January 18, 2024,

Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to

Dismiss (Dkt. 10) ("Plaintiff's Response").  On February 16, 2024, Defendants filed

Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss

(Dkt. 13) ("Defendants' Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendants' motion should be GRANTED.


## FACTS[2]

On December 23, 2010, well prior to the events giving rise to this action, the

United States Department of Education ("DOE") Office for Civil Rights ("OCR") initiated

a compliance review of the handling by the State University of New York ("SUNY") of

complaints of sexual assault/violence, and sexual harassment under the various

procedures used throughout SUNY as well as at four individual SUNY campuses

including SUNY at Albany, SUNY-Buffalo State College, SUNY-Morrisville State

College, and SUNY at New Paltz ("the compliance review").[3]   UB was not among the

individual SUNY campuses subjected to the compliance review.  As explained in the

DOE's letter, the compliance review particularly focused on whether SUNY responded

promptly and effectively to such complaints, especially those concerning sexual

assault/violence.  OCR initiated the compliance review under Title IX of the Education

Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and the

---

[2] Taken from the Complaint filed in this action.

[3] Details of the compliance review are provided in a letter dated October 31, 2012 from the DOE to Dr. Nancy L. Zimpher, then SUNY Chancellor ("DOE's letter").  The DOE letter is referenced in the Complaint which also includes a hyperlink to the internet website containing the entire DOE letter, thereby incorporating the DOE's letter into the Complaint.  Complaint ¶ 101 n. 2 (citing https://www2.ed.gov.about/ offices/list/ocr/docs/investigations/02116001-a.html).

regulations promulgated thereunder at 34 C.F.R. Part 106 ("implementing regulations"),

prohibiting sex-based discrimination in programs and activities receiving federal

financial assistance from the DOE, including SUNY.  OCR informed SUNY of three

deficiencies revealed by the compliance review including that (1) SUNY had yet to

designate a Title IX coordinator at the system-wide level; (2) the required Title IX

notices of non-discrimination were not posted in any SUNY reports or publications; (3)

SUNY's discrimination complaint procedure did not define sexual assault or violence.

To address the deficiencies, on September 30, 2013, OCR and SUNY entered into a

Voluntary Resolution Agreement ("VRA"),[4] whereby SUNY agreed that each SUNY

campus, including UB, would "'take appropriate disciplinary action against those who

violate University/campus policies and procedures addressing sex discrimination' and

'take prompt and effective responsive action reasonably designed to end a hostile

environment if one had been created, prevent its recurrence, and, where appropriate,

take steps to remedy the effects of the hostile environment.'"  Complaint ¶ 103 (quoting

VRA at 1).

      In statistics reported by DOE in 2016 regarding campus sexual assaults, UB

listed only one instance of reported rape.  Pursuant to New York State Education Article

129-B and 2014 and 2018 SUNY Board Policies, SUNY conducted a survey of the

campus climate regarding sexual and interpersonal violence every other year, including

in 2019, 2021, and 2023 ("the survey").  As of the filing of the Complaint, statistics from

the survey results had been compiled only for 2019, and showed of 11,958 female

---

[4] The VRA is referenced in the Complaint which also includes a hyperlink to the internet website
containing the VRA, thereby incorporating the VRA into the Complaint.  Complaint ¶ 103 n. 4 (citing
https://www2.ed.gov.about/offices/list/ocr/docs/investigations/02116001-b.html).

students surveyed, 378 experienced unwanted sexual comments, sexual slurs, or demeaning jokes, 128 experienced unconsented fondling, kissing, or rubbing against private areas of their bodies, and 41 responded someone sexually penetrated them without their consent.  UB implemented a "Sex Signals" course, a required course during freshman orientation, that discusses the dangers of sexual assault on campus to assist students in understanding how a sexual assault situation may happen within a "situational context" as well as some of the factors that may lead to an assault.  Complaint ¶ 106.

On September 3, 2022, Plaintiff Kara Marino ("Plaintiff"), then a student attending Defendant State University of New York at Buffalo ("UB"), and two of Plaintiff's friends attended an off-campus party, and then a party at the apartment ("the apartment") of one Steven Ramirez ("Ramirez" or "the assailant").[5]  Initially, Plaintiff and Ramirez were flirtatious with each other, and Ramirez, with Plaintiff's consent, began caressing Plaintiff's thigh.  Plaintiff and Ramirez then entered Ramirez's bedroom where the physical contact, with Plaintiff's consent, escalated, at first with Plaintiff's consent.  Plaintiff and Ramirez laid down on Ramirez's bed, and Plaintiff consented to Ramirez removing her pants.  Ramirez then digitally penetrated Plaintiff's vagina with a single

---

[5] It is not alleged in the Complaint whether the apartment was located on UB's campus.  Although in papers opposing Defendants' motion, Plaintiff maintains the Complaint alleges the "assault occurred in on-campus apartment," Plaintiff's Response at 18 (referencing Complaint ¶¶ 20-23), such assertion is extrinsic evidence that has not been properly pleaded and, thus, cannot be considered by the court on the instant motion to dismiss.  *See United States ex rel. Foreman v.* AECOM, 19 F.4th 85, 107 (2d Cir. 2021) (when considering motion to dismiss pursuant to Rule 12(b)(6), the district court may not rely "on factual allegations contained in legal briefs or memoranda") (quoting *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000)).  The court presumes for the sake of this discussion that UB's Student Code of Conduct applies to conduct both on-campus as well as off-campus.  *See Roe v. St. John's University*, 91 F.4th 643, 653-60 (2d Cir. 2024) (denying plaintiff's challenge to his expulsion from defendant university as the result of a campus disciplinary hearing that concluded the plaintiff committed two sexual assaults including one that occurred in the plaintiff's off-campus residence).

finger, then two fingers, which Plaintiff permitted.  When Ramirez began penetrating

Plaintiff with three and four fingers, however, Plaintiff experienced pain and wanted to

revoke her consent but did not out of fear.  Ramirez then attempted to digitally penetrate

Plaintiff's anus, an act to which Plaintiff verbally informed Ramirez she did not consent.

Ramirez then attempted to insert his entire hand into Plaintiff's vagina, causing Plaintiff

to leap away.  Ramirez unzipped his pants and attempted to engage in vaginal sex with

Plaintiff but was unable to.  Understanding they would not be engaging in vaginal sex,

Ramirez responded by kissing Plaintiff with such force as to hold Plaintiff down, using

his larger body to push and hold Plaintiff down, then repeatedly forcefully and violently

thrust his entire hand into Plaintiff's vagina and when Plaintiff attempted to push away

Ramirez's hand, he pinned Plaintiff's arm behind her back.  When Ramirez eventually

removed his hand from Plaintiff's vagina, it was covered in Plaintiff's blood up to his

wrist.  Plaintiff, in an effort to stop Ramirez's conduct, stated she needed to pick up her

best friend, at which point Ramirez ceased all sexual activity.

While dressing, Plaintiff got blood on her hands, and noticed the blood on

Ramirez's hands and pooled onto the bedsheets.  Plaintiff, hoping to retain evidence of

Ramirez's sexually assaultive conduct ("the assault"), offered to take the bedsheets and

wash them for Ramirez, but Ramirez declined the offer and poured liquid Plaintiff

believed to be hydrogen peroxide onto the sheets.  Both Plaintiff and Ramirez then

washed the blood from their hands in Ramirez's bathroom sink and Plaintiff noticed the

blood being washed from Ramirez's hands contained small pieces of something that

Plaintiff believed were scratched from her vaginal wall.  Ramirez, then fully unclothed,

"slumped onto the toilet as if he were sloppy drunk," bid Plaintiff goodbye, telling Plaintiff

he would see her the next day, and Plaintiff rushed downstairs and out of the apartment. Complaint ¶ 49.

Multiple people remaining in Ramirez's apartment witnessed Plaintiff after the assault and described Plaintiff as appearing "spooked" and "clearly in distress." Complaint ¶ 50.  Those witnesses investigated Ramirez's room and found both the bloody bedsheets and Ramirez in his bathroom, partially clothed and passed out in the bathtub.  Upon the entrance of one of his roommates into the bathroom, Ramirez regained consciousness and "recognized he was still severely intoxicated, and had been severely intoxicated throughout the entirety of his interaction with Plaintiff that night."  Complaint ¶ 51.

After leaving the apartment, Plaintiff returned to her own apartment, but felt excruciating pain throughout her vagina and insides which were burning and throbbing. Plaintiff, accompanied by some friends, went to Millard Fillmore Suburban Hospital ("the hospital") where the staff, including a licensed Sexual Assault Nurse Examiner ("SANE") performed a sexual assault evaluation and Plaintiff was diagnosed with "Sexual Assault."  Complaint ¶ 53.  Prior to being discharged from the hospital. Plaintiff was informed by Investigator Terry Banas ("Banas") of the New York State University Police Department ("SUNY Police"), advised Plaintiff she could seek justice through either the New York criminal courts or UB's Campus Conduct Process, or both.  Plaintiff chose to pursue both avenues of justice.

On September 6, 2022, Sharon Nolan-Weiss ("Nolan-Weiss"), UB's Title IX Coordinator, e-mailed Plaintiff to acknowledge Plaintiff's police report, and on September 8, 2022, Plaintiff responded that because of the assault, Plaintiff was

withdrawing from UB for the rest of the semester.  On September 13, 2022, Plaintiff reported the assault to UB on a Title IX Grievance Formal Complaint Form ("Title IX grievance").  Nolan-Weiss then investigated the Title IX grievance by interviewing Ramirez, his roommates, and Plaintiff's friends ("the investigation").  On November 4, 2022, Nolan-Weiss provided Plaintiff with the evidence gathered during the investigation ("investigation report") and after reviewing the evidence, Plaintiff alerted Nolan-Weiss to several discrepancies in the investigation report.  On November 30, 2022, Nolan-Weiss advised Plaintiff of the details of the Student Conduct Hearing Process including that Ramirez would have an opportunity to provide a response to the investigation report.  On December 1, 2022, Nolan-Weiss informed Plaintiff that Ramirez never responded to the investigation report and that Nolan-Weiss's final report would be issued the next day.

On January 18, 2023, UB conducted via Zoom a Title IX hearing ("disciplinary hearing") regarding the Title IX grievance.  Both Plaintiff and Ramirez were represented by legal counsel at the disciplinary hearing.  The purpose of the disciplinary hearing was to determine whether a preponderance of the evidence established that Ramirez violated UB's Title IX Grievance Policy ("Title IX policy) and Student Code of Conduct ("UB's code of conduct").  On February 1, 2023, UB issued its disciplinary hearing decision ("hearing decision"), concluding, based on a preponderance of the evidence, that "no code of conduct violation occurred."  Complaint ¶ 63.  On February 15, 2023, Plaintiff appealed the hearing decision[6] arguing the Title IX process was riddled with

---

[6] Plaintiff does not identify to whom the hearing decision was appealed other than "to Defendant UB." Complaint ¶ 99.

multiple procedural defects having a significant effect on the hearing decision, but the hearing decision was upheld.[7]

Plaintiff then commenced this action raising several objections to the hearing decision on which Plaintiff's Title IX claims are based.  In particular, Plaintiff maintains UB's hearing decision failed to use its own definition of consent when considering the evidence presented at the disciplinary hearing, that UB's disciplinary hearing officers either willfully or recklessly ignored that Plaintiff was diagnosed by a SANE with sexual assault, the hearing officers failed to consider statements provided by other students that supported Plaintiff's version of the assault, and the hearing officers failed to access the credibility of the witnesses.

**DISCUSSION**

**1.    Motion to <u>Dismiss</u>**

A complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (rejecting longstanding precedent of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In considering a motion to dismiss pursuant to Rule 12(b)(6), the Supreme Court requires application of "a 'plausibility standard . . . .'"  *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Twombly*, 550 U.S. at 570, and quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  On a motion to dismiss under Rule 12(b)(6), the court looks to the four corners of the complaint and is required to accept the plaintiff's

---

[7] The record does not indicate the date the hearing decision was upheld.

nonconclusory allegations as true and to construe those allegations in the light most favorable to the plaintiff.  *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'  *Id.* (quoting *Twombly*, 550 U.S. at 557)

"[A] Rule 12(b)(6) motion is addressed to the face of the pleading."  *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir. 1985).  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the [pleading] as exhibits, and documents incorporated by reference in the [pleading]."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the [claimant]."  *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,

843 F.3d 561, 566 (2d Cir. 2016).  "While a [pleading] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [claimant]'s obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  Further, applying the standard for a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) "is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *In re Amaranth Natural Gas Commodities Litigation*, 730 F.3d 170, 80 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

In support of dismissal, Defendants argue Plaintiff fails to plausibly allege against Defendants either a Title IX post-harassment claim, Defendants' Memorandum at 9-12, or a Title IX pre-harassment claim, *id*., at 12-4, and that immunity pursuant to the Eleventh Amendment bars the state claims against Defendants.  *Id*. at 14-15.  In opposition to dismissal, Plaintiff argues she properly alleges against Defendants both pre-harassment and post-harassment claims under Title IX, Plaintiff's Response at 15-23, that UB's deliberate indifference caused Plaintiff harm, *id*. at 23-26, and that Defendants are not immune under the Eleventh Amendment from liability on the state law claims.  *Id*. at 26-27.  In further support of dismissal, Defendants argue Plaintiff fails to plausibly state against Defendants either a Title IX pre-harassment claim, Defendants' Reply at -4, or a post-harassment claim, *id*. at 4-7, that UB's alleged deliberate indifference did not subject Plaintiff to further harassment, *id*. at 7-8, and that Plaintiff misapprehends Congress's abrogation of the states' Eleventh Amendment immunity under Title IX.  *Id*. at 8-9.

2.    **Title IX**

Title IX of the United States Education Amendments of 1972, 20 U.S.C. § 1681,

*et seq*. ("Title IX" or "the Act"), provides that "[n]o person in the United States shall, on

the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal

financial assistance. . . ."  20 U.S.C. § 1681(a).  "Sexual harassment[8] is a form of

discrimination prohibited by Title IX."  *Posso v. Niagara University*, 518 F.Supp.3d 688,

696 (W.D.N.Y. 2021) (citing *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 649-50

(1999) ("*Davis*").  There are three ways Title IX prohibits sex discrimination at all levels

of education including "(1) no one may be excluded from participation in any educational

program or activity; (2) no one may be denied the benefits of any educational program

or activity; and (3) no one may be subjected to discrimination under any education

program or activity."  *Tubbs v. Stony Brook University*, 343 F.Supp.3d 292, 307

(S.D.N.Y. 2018) ("*Tubbs I*") (citing 20 U.S.C. § 1681(a)).

---

[8] The court notes that the described conduct allegedly perpetrated on Plaintiff by the assailant constitutes aggravated sexual abuse under at least one section of N.Y. Penal Law §§ 130.65-a, 130.66, and 130.67, and is a felony offense, rather than harassment under N.Y. Penal Law §§ 240.25 to 240.31, which is, at most, a misdemeanor and sometimes a violation.  Nevertheless, the regulations promulgated under Title IX define sexual harassment to include, *inter alia*, "sexual assault" as defined under 20 U.S.C. § 1092(f)(6)(A)(v).  34 C.F.R. § 106.30(a).  Relevantly, 20 U.S.C. § 1092(f)(6)(A)(v), which pertains to the required disclosure of campus security police and campus crime statistics, defines "sexual assault" as "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation."  Under the FBI's crime reporting system, sexual assault includes the following forcible sex offenses: rape, sodomy, sexual assault with an object, and fondling.  David A. Grenardo, An Intersection of Gender, Race, and Sports: Guidelines for Universities Determining Whether Athletes Accused of Title IX Violations Should Be Removed from Their Teams, 9 Berkeley J. Ent. & Sports L. 41, 54 n. 63 (2020) (citing Criminal Justice Information Services Division Uniform Crime Reporting Program, 2019 National Incident-Based Reporting System User Manual at 41-42, 60, https://ucr.fbi.gov/nibrs/nibrs-user-manual [https://perma.cc/X9NP-Q98E]).  Accordingly, the court attributes the various courts' use of the term "harassment" for criminal conduct which, in the common parlance, is more accurately denominated either as "sexual assault" or "sexual abuse," to the relevant regulation's broad definition of "harassment."

Title IX applies to a school's disparate provision of programs, aid, benefits or services, or the inequitable application of rules or sanctions on the basis of sex, and also prohibits a school's deliberate indifference to acts of sexual harassment committed by one student against another, so-called "student-on-student harassment."  *Davis*, 526 U.S. at 646–47.  The Supreme Court recognizes an implied private right of action under Title IX, *Cannon v. University of Chicago,* 441 U.S. 677, 709 (1979), for which money damages are available.  *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 76 (1992).  A college or university that receives federal funding is subject to Title IX liability for deliberate indifference to student-on-student sexual harassment.  *Davis*, 526 US. at 646-47 (concluding that federal funding recipients may be liable for private damages under Title IX "where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment").  Further, because of shared goals, "courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII."  *Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994) ("*Yusuf*") (citing cases).

Under Title IX courts recognize two different claims arising from student-on-student sexual harassment including pre-harassment conduct and post-harassment conduct.  *Tubbs I*, 343 F.Supp.3d at 318.  In the instant case, Plaintiff asserts both a pre-harassment and a post- harassment Title IX claim.

Title IX "indirectly prohibits sexual harassment on the basis that harassment can be a form of sex discrimination when it leads to a hostile environment, which then impedes one's access to the benefits of an educational program."  *Tubbs I*, 343 F.Supp.3d at 307.  "Accordingly, a school may be liable for sexual harassment if it

allows a hostile environment to persist – that is, when a school knows about severe or pervasive harassment and fails to immediately take steps to quell it."  *Id*.  Nevertheless, "[b]ecause a school's liability under Title IX hinges on pervasive enough harassment to create a hostile environment that endangers educational opportunities and a deliberate failure to mitigate the situation, it is a high bar for a school to be liable for student-on-student harassment."  *Id*.  Further, to survive a motion to dismiss, a plaintiff bringing a student-on-student sexual harassment Title IX claim must allege that: (1) a federally funded educational institution (2) was deliberately indifferent to and (3) had actual knowledge of (4) sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to have deprived the plaintiff of access to the educational opportunities or benefits. *Davis*, 526 U.S. at 650.

In the instant case, regarding the first element of a Title IX claim, Plaintiff alleges, Complaint ¶ 11, and Defendants do not dispute, that UB receives federal funding and is thus subject to Title IX.  Further, although the assault perpetrated upon Plaintiff was only a single incident, relevant caselaw holds that such assault was sufficiently "severe, pervasive, and objectively offensive" so as to satisfy the fourth element.  *See AA by BB v. Hammondsport Central School District*, 527 F.Supp.3d 501, 511 (W.D.N.Y. 2021) (acknowledging that while a single incident of student-on-student harassment generally will not be enough to support a Title IX sexual harassment cause of action, a single instance of extreme conduct such as rape is sufficiently severe to state such a claim). Accordingly, the first and fourth elements necessary to state a claim for Title IX liability are met in this case.  Nevertheless, whether Plaintiff has sufficiently alleged the remaining second and third elements for her pre-harassment and post-harassment

claims, *i.e.*, requiring both that Defendants had actual knowledge of the alleged discrimination but were deliberately indifferent to such discrimination, *Posso*, 518 F.Supp.3d at 696-97, are in dispute for the purposes of Defendants' motion.

"A college or university has actual knowledge when 'a school official with authority to address the alleged discrimination had actual knowledge of the discrimination.'" *Posso*, 518 F.Supp.3d at 696-97 (quoting *Carabello v. New York City Dept. of Educ.*, 928 F.Supp.2d 627, 638 (E.D.N.Y. 2013) (citing cases)). "'A defendant acts with deliberate indifference for Title IX purposes 'when the defendant's response to known discrimination is *clearly* unreasonable in light of the known circumstances.'" *Id.* at 697 (quoting *Roskin-Frazee v. Columbia University*, 2018 WL 6523721, at * 4 (S.D.N.Y. Nov. 26, 2018) ("*Roskin-Frazee*") (quoting *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (italics in *Roskin-Frazee*)). The court thus considers whether Plaintiff has plausibly alleged the second and third elements for the Title IX claims.

### A. Pre-Harassment Claim

Plaintiff's Second Claim alleges sex discrimination in violation of Title IX based on Defendants' creation of a sexually hostile and abusive environment. Complaint, Second Claim. In support of dismissal, Defendants argue Plaintiff has failed to plausibly allege that Defendants had actual, as opposed to general, notice of deficiencies in their specific policies and responses to sexual assault and that Defendants' subsequent failure to remedy the policies was the proximate cause of the assault. Defendants' Memorandum at 12-14. In opposition, Plaintiff argues her allegations regarding Defendants' "general knowledge of the prevalence of sexual misconduct on . . . [SUNY]

campuses," including at UB, and Defendants' subsequent failure to take action about the sexual misconduct on UB's campus created a hostile environment resulting in Plaintiff becoming a victim of UB's deficient and outdated Title IX polices and procedures.  Plaintiff's Response at 15-19.  In further support of dismissal, Defendants argue Plaintiff's failure to plead that Defendants had actual knowledge of a heightened risk of sexual assault on campus is fatal to her pre-harassment claim because Defendants were not required to remedy any deficient policies absent actual knowledge of a heightened risk specific enough to allow such remedy.  Defendants' Reply at 2-4.  Plaintiff's Second Claim asserting pre-harassment discrimination should be dismissed for failing to sufficiently allege Defendant possessed actual knowledge of a heightened risk of sexual assault in the context of the assailant's assault on Plaintiff.

Generally, courts have refrained from imposing Title IX liability based on a university's official policy.  *Roskin-Frazee*, 2018 WL 6523721, at * 4 (citing *Tubbs v. Stony Brook Univ.*, 2016 WL 8650463, at *8 (S.D.N.Y. Mar. 4, 2016) ("*Tubbs II*"). Only in a limited number of cases have courts found Title IX liability based on pre-harassment deliberate indifference, including when a university has "'actual knowledge of sexual assault(s) committed in a *particular* context or program or by a *particular* perpetrator or perpetrators,'" and the Second Circuit has yet to address the issue.  *Id*. (quoting *Tubbs II*, 2016 WL 8650463, at *9 & n. 2 (emphases in *Roskin-Frazee*)).  Examples of the narrow circumstances in which universities have been found liable under Title IX for pre-harassment deliberate indifference include *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007), where the court found sufficient evidence on which a reasonable jury could conclude the defendant university's official policy maintained and supported a

sports recruiting program, consisting of inviting high school athletes to the university where they were then paired with female "Ambassadors" so as to show the recruits a "good time."  *Id*. at 1173.  Under these circumstances, the defendant university was held to possess actual knowledge of a significantly heightened risk of sexual assault within that very program.  *Id*. at 1184-85.  Similarly, in *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007), the lower court's grant of defendant's motion to dismiss was reversed because, prior to plaintiff's assault, the university allegedly knew specific facts about the perpetrator's history of past sexual harassment at other colleges that substantially increased the risk that the perpetrator would harass another student at the university. *Id*. at 1296–97.

In contrast, in the instant case, Plaintiff's allegations not only fail to allege that Defendants had actual knowledge of a specific heightened risk of sexual assault by the assailant, but Plaintiff relies on Defendants' general knowledge of assaults on UB's campus, Complaint ¶¶ 104-11, SUNY's entering into the VRA with the OCR on September 30, 2013, according to which each SUNY campus, including UB was to take appropriate disciplinary action against anyone who violated UB policies and procedures addressing sex discrimination, as well as prompt and effective responsive action reasonably designed to end any hostile environment, prevent the recurrence of such environment, and remedy the effects of such environment, *id*. ¶¶ 103-04, and a local television news station's report concerning Nolan-Weiss's discussion of UB's implementation of the "Sex Signals" required course designed to inform entering freshman and students how best to discern signals that a sexual assault may happen in a particular situation.  *Id*. at 105-06.  Although such allegations may support an

inference that Defendants were generally aware of "the problem of sexual misconduct on campus and a deficiency in response to such a problem, this general level of awareness or deficiency is insufficient for purposes of asserting pre-assault, Title IX liability." *Roskin-Frazee*, 2018 WL 6523721, at * 6.  Rather, "'something more than [a] general knowledge of assaults campus-wide (*i.e.*, some greater specificity) is required to satisfy the actual knowledge requirement [for Title IX liability].'" *Id.* (quoting *Tubbs II*, 2016 WL 8650463, at *9).  *See Posso*, 518 F.Supp.3d at 698 ("'a plaintiff must allege additional facts beyond past incidents of assault on campus to sustain a pre-assault Title IX claim,' but those facts need only give the school notice 'of a heightened risk that is specific enough to allow it to remedy such a policy.'" (quoting *Tubbs II*, 2016 WL 8650463, at *8, *10)).  Significantly, it is not the intent of Title IX that a university must "purge" itself of all "actionable peer harassment."  *Id.* (citing *Davis*, 526 U.S. at 648)).

Accordingly, Plaintiff's failure to allege any facts establishing Defendants had actual, rather than general, knowledge of a specific threat posed by the assailant and were deliberately indifferent to the threat requires Defendants' motion be GRANTED as to Plaintiff's Second Claim asserting pre-harassment discrimination.[9]

### B.    Post-Harassment Claim

In her First Claim, Plaintiff alleges sex discrimination in violation of Title IX based on Defendants' failure to adequately respond to her allegations of sexual assault. Complaint, First Claim.  In support of dismissal, Defendants argue Plaintiff fails to allege Defendants acted with deliberate indifference in response to Plaintiff's assault claim,

---

[9] The determination that Plaintiff has failed to sufficiently allege Defendants had actual knowledge of the risk the assailant posed to Plaintiff renders moot the question whether the Defendants were deliberately indifferent to such knowledge.

and even if Defendants were deliberately indifferent, it did not subject Plaintiff to further harassment.  Defendants' Memorandum at 9-12.  In opposition, Plaintiff argues she has adequately alleged that Defendants' response to the assault was "clearly unreasonable" under the circumstances so as to establish Defendants were deliberately indifferent to student-on-student sexual harassment in violation of Title IX.  Plaintiff's Response at 19-26 (quoting *Posso*, 518 F.Supp.3d at 697).  In further support of dismissal, Defendants maintain that Plaintiff does not contest that she failed to state a Title IX post-harassment claim related to SUNY's procedural response to her sexual assault allegation, but claims she stated a Title IX post-harassment claims based on the "erroneous outcome theory," which not only fails to comport with the Second Circuit's recent decision regarding such claims, but also fails because Plaintiff has not alleged that the asserted erroneous outcome was motivated by her sex.  Defendants' Reply at 4-7 (citing *Roe v. St. John's University*, 91 F.4th 643 (2d Cir. 2024)).  Plaintiff fails to plausibly allege a post-harassment Title IX claim.

"'Generally,' a plaintiff 'attacking a university disciplinary proceeding on grounds of gender bias' asserts that the university is liable under one or both of two separate theories: an erroneous outcome theory or a selective enforcement theory."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) ("*Yusuf*").  As Defendants observe, Defendants' Memorandum at 10-11, Plaintiff is not claiming Defendants discouraged her from filing a Title IX complaint, failed to investigate the assault, that the investigation was too long, the disciplinary hearing procedures were inadequate, or that the hearing panel failed to provide Plaintiff with the necessary hearing materials, all issues on which deliberate indifference to sexual assault claims are usually predicated.  Rather, Plaintiff

alleges several mistakes during the disciplinary hearing that Plaintiff alleges establishes the hearing outcome was erroneous.  Complaint ¶¶ 64-98.  Based on these allegations, Defendants maintain Plaintiff's post-harassment Title IX claim asserts an "erroneous outcome theory" based on the hearing decision, Defendants' Reply at 1, and Plaintiff does not argue otherwise.

Defendants also argue that because Plaintiff was the complainant, rather than the respondent to the disciplinary hearing, not only is there no basis on which Plaintiff can assert a selective enforcement theory, but that the erroneous outcome theory of liability is only applicable to post-harassment Title IX claims brought by individuals disciplined in response to an alleged sexual assault.  Defendants' Reply at 5.  In support of this argument, Defendants reference the Second Circuit's statement that "'[t]he essence of an erroneous outcome claim is that due at least in part to the plaintiff's sex, the university wrongfully concluded that the plaintiff committed misconduct.'"  *Id*. (quoting *Roe v. St. John's University*, 91 F.4th 643, 652 (2d Cir. 2024) ("*St. John's Univ.*")).  However, this statement was rendered in connection with an action brought by a plaintiff who, having been found guilty of committing two sexual assaults in violation of the university's code of conduct and expelled from the university, claimed that anti-male bias influenced the university's adjudication of the sexual misconduct accusations against him.  *Id*. at 647.  Accordingly, the Second Circuit was not asked to consider whether such a claim could be asserted by the victim of an assault for which the assailant was not found to have violated the applicable code of conduct.  Nor does the Second Circuit's description of what must be alleged to state a Title IX post-harassment

claim based on an erroneous disciplinary hearing's outcome preclude such a claim by the victim of an assault.

In particular, the Second Circuit instructs that when basing a Title IX claim on an alleged erroneous outcome, "the plaintiff must allege (1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) 'circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *St. John's Univ.*, 91 F.4th at 652 (quoting *Yusuf*, 35 F.3d at 715). These required elements, construed in the Plaintiff's favor on Defendants' motion to dismiss, could apply to an erroneous outcome theory asserted by the complainant in a disciplinary hearing.  Nevertheless, in the instant case, Plaintiff's post-harassment Title IX claim fails because even assuming, *arguendo*, that the Complaint alleges sufficient facts casting "some articulable doubt on the accuracy of the disciplinary proceedings," *Yusuf*, 35 F.3d at 715, the Complaint fails to allege any "circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."  *Id*.  Significantly, "an allegation of an erroneous outcome, absent any additional allegations of fact indicating bias on account of sex, does not state a claim under Title IX."  *St. John's Univ.*, 91 F.4th at 654 (citing cases).

Plaintiff's pleading burden for an erroneous outcome claim "is not heavy" and, as here, a successful "complaint may also allege particular procedural flaws affecting the proof."  *Yusuf*, 35 F.3d at 715.  Plaintiff alleges that when considering the evidence UB failed to apply its own definition of "consent" appearing in UB's code of conduct, and also improperly assessed and weighed the evidence including the witnesses' credibility and Plaintiff's use of alcohol that would interfere with Plaintiff's ability to consent as well

as Plaintiff's description of the assault and her asserted repeated statements and actions indicating that she did not consent to the assailant's actions.  Complaint ¶¶ 64-79.  Plaintiff also maintains the hearing officers ignored evidence that Plaintiff was diagnosed by a SANE with sexual assault, *id*. ¶¶ 80-82, concluded, consistent with the assailant's testimony, that the assailant "inserted no more than two fingers" into Plaintiff's vagina, *id*. ¶ 83, did not mention that other students who witnessed Plaintiff after the assault told the Title IX investigator that Plaintiff "looked spooked," *id*. at 84-86, that the assailant's roommates noticed the blood on the assailant's bedsheets and found the assailant in the bathtub with blood on him, *id*. ¶ 87, and failed to assess the credibility of the witnesses, even giving the assailant's recollection of the events of the night of the assault the same weight as Plaintiff's version despite evidence of the assailant's intoxication.  *Id*. ¶¶ 88-98.  These allegations might be sufficient to state an erroneous outcome theory if Plaintiff also alleged the hearing officers were motivated by Plaintiff's sex in permitting the procedural flaws that resulted in the disciplinary hearing decision that the assailant did not violate UB's code of conduct.  *St. John's Univ*., 91 F.4th at 653-54 (citing *Doe v. Columbia Univ*., 831 F.3d 46, 57 (2d Cir. 2016), and *Yusuf*, 35 F.3d at 715 (explaining that a plaintiff proceeding on erroneous outcome theory of Title IX sexual harassment must allege both facts casting doubt on the disciplinary proceeding's outcome and "allegations relating to a causal connection between the flawed outcome and gender bias")).  Further, in considering a motion to dismiss for failure to state a claim, "alleged 'procedural errors are not inevitably a sign of sex bias.'" *Id*. (quoting D*oe v. Stonehill Coll., Inc.*, 55 F.4th 302, 334 (1st Cir. 2022)).

"[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.  The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias. A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.   Sufficient "[a]llegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases."  *Id*. (citing *Silver v. City University of New York,* 947 F.2d 1021 (2d Cir.1991);*Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157 (2d Cir.), *cert. denied,* 502 U.S. 880 (1991); *Krieger v. Gold Bond Bldg. Prods.,* 863 F.2d 1091 (2d Cir.1988)). "Such allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Id*.  In the instant case, the Complaint is utterly devoid of any allegations attributing the outcome of the hearing decision to any bias on the basis of Plaintiff's sex thus supporting GRANTING Defendants' motion.

Alternatively, as Defendants further argue, Defendants' Memorandum at 11-12; Defendants' Reply at 7-8, even if Plaintiff sufficiently alleged that the hearing decision was erroneously decided and that such erroneous outcome was predicated on bias against Plaintiff based on her sex, Plaintiff has also failed to allege she was subjected to any further harassment based on Defendants' deliberate indifference to her upon learning of the assault.  Specifically, a Title IX post-harassment claim requires that the school's deliberate indifference to student-on-student harassment cause, at a minimum,

a student to undergo further harassment or render the student vulnerable to further harassment. *Davis*, 526 U.S. at 642. "The Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment." *Elgamil v. Syracuse University*, 2000 WL 1254122, at * 9 (N.D.N.Y. Aug. 22, 2000) (italics in original). Although following the assault, Plaintiff withdrew from UB and re-enrolled at a different SUNY campus, Plaintiff fails to adequately allege facts attributing such her actions to further harassment after the assault; rather, Plaintiff withdrew from UB on September 8, 2022, five days after the assault and five days before Plaintiff even filed the Title IX complaint. The Complaint fails to allege when Plaintiff decided to re-enroll at a different SUNY campus. Accordingly, the Complaint fails to allege facts which, if decided in Plaintiff's favor, would establish that Plaintiff's actions in withdrawing from UB and re-enrolling at a different SUNY campus were attributed to further harassment Plaintiff experienced after UB learned of the assault.

Defendants' motion should be GRANTED as to Plaintiff's First Claim asserting a post-harassment Title IX claim.

**3.    State Law Claims**

Plaintiff's State law claims include breach of contract, Complaint, Third Claim, negligent infliction of emotional distress, *id*., Fourth Claim, and negligence, *id*., Fifth Claim. In support of dismissal, Defendants argue all three state law claims are barred by Eleventh Amendment immunity. Defendants' Memorandum at 14-15 (citing cases). In opposition, Plaintiff agrees that generally the Eleventh Amendment "prohibits suits against state governments in federal court," Plaintiff's Response at 26 (citing *Richardson v. New York State Dep't of Correctional Serv*., 180 F.3d 426, 447-48 (2d

Cir. 1999), and that the immunity "extends to a state entity that is an 'arm of the State,'"
*id*. (quoting *Northern Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189, 194
(2006), but maintains Congress abrogated the states' Eleventh Amendment immunity
under Title IX, *id*. at 27 (citing *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60,
72-73 (1992), as well as with regard to any other remedy available in any action brought
under Title IX.  *Id*.  In further support of dismissal, Defendants argue that although
Congress did abrogate the states' Eleventh Amendment immunity under Title IX, "that
abrogation does not extend to state law claims premised on the same conduct."
Defendants' Reply at 8 (citing *Hauff v. State University of New York*, 425 F.Supp.3d
116, 129 (E.D.N.Y. 2019)).

     "The Eleventh Amendment has long been construed as barring a citizen from
bringing a suit against his or her own state in federal court, under the fundamental
principle of 'sovereign immunity' . . . .  This immunity extends not only to the states, but
also to state agencies . . . .  The Eleventh Amendment also bars suits for damages
against state officials acting in their official capacities."  *Bell v. N.Y. State Dep't of Corr.*,
2018 WL 11219948, *3 (N.D.N.Y. Mar. 20, 2018) (citing cases and quoting U.S. Const.
amend. XI).  The Eleventh Amendment provides absolute immunity to states "unless
they have waived their Eleventh Amendment immunity, or unless Congress has
abrogated the states' Eleventh Amendment immunity. . . ."  *Gollomp v. Spitzer*, 568 F.3d
355, 366 (2d Cir. 2009) (internal quotation marks and citations omitted).  Significantly,
New York has not waived its Eleventh Amendment immunity to suit in federal court.
*Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).  Further,
the issue before the Supreme Court in *Franklin*, on which Plaintiff relies, was not

whether Congress's abrogation of Eleventh Amendment immunity under Title IX also extended to state law claims, but whether such abrogation permitted a damages remedy to enforce Title IX.  *Franklin*, 503 U.S. at 76.

In the absence of any case law establishing Congress abrogated Eleventh Amendment immunity as to claims against the state predicated on violation of state law, Defendants' motion should be GRANTED with regard to Plaintiff's Third, Fourth, and Fifth Claims.

**4.      Dismissal With or Without Prejudice**

Plaintiff argues that if Defendants' motion is granted, then Plaintiff should be granted leave to file an amended complaint.  Plaintiff's Response at 27.  Defendants do not respond to this request.

As a general matter, '[t]he district court has discretion whether or not to grant leave to amend, and its decision is not subject to review on appeal except for abuse of discretion . . . .'"  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (quoting 3 *Moore's Federal Practice* ¶ 15.08 [4], at 15–64 (2d ed. 1992) (footnotes omitted), and citing *Foman v. Davis,* 371 U.S. 178, 182 (1962), and *Evans v. Syracuse City School District,* 704 F.2d 44, 47 (2d Cir. 1983)).  Although in exercising such discretion, "the district court is required to heed the command of Rule 15(a) to grant leave to amend 'freely . . . when justice so requires,'" *id.* (quoting Fed.R.Civ.P. 15(a), and citing *Foman,* 371 U.S. at 182, *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir. 1990), and 3 *Moore's Federal Practice* ¶ 15.08[4], at 15–65), "[w]here it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.  *Id.* (citing *Foman,* 371 U.S. at 182 (denial not abuse of

discretion where amendment would be futile), *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir. 1990) ("where ... there is no merit in the proposed amendments, leave to amend should be denied"); and *Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2d Cir. 1982) (denial not abuse of discretion where plaintiff had had "access to full discovery" in a related case)).  *See also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming dismissal of plaintiff's claim for failure to state a claim with prejudice and without leave to replead where even a liberal reading of complaint failed to suggest plaintiff had merely inadequately or inartfully pleaded and plaintiff, speaking through counsel on appeal, suggested no new material that could be pleaded to sufficiently reframe claim, such that repleading would be futile).  Nor does a district court abuse its discretion in denying leave to replead where the papers provide "no clue as to how the complaint's deficiencies would be cured."  *Noto v. 22nd Century Group, Inc.*, 35 F.4th 95, 107 (2d Cir. 2022).

     In the instant case, the problems with Plaintiff's Title IX claims as pleaded against Defendants are not substantive such that further pleading cannot cure them and would be futile.  *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1992) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").  Accordingly, the dismissal of Plaintiff's Title IX claims should be without prejudice and with leave to replead.

     The dismissal of Plaintiff's State law claims, however, is based on the determination that such claims are barred by Eleventh Amendment immunity which is substantive and thus cannot be cured upon further pleading.  *Ruffolo*, 987 F.2d at 131 (denial of leave to amend is not an abuse of discretion where further pleading is

"unlikely to be productive").  The dismiss of the State law claims thus should be with prejudice and without leave to replead.

## **CONCLUSION**

Based on the foregoing, Defendants' motion (Dkt. 7), should be GRANTED and the Complaint should be DISMISSED without prejudice and with leave to replead as to the Title IX claims, but with prejudice and without leave to replead as to the State law claims.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      June 21, 2024
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.


/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      June 21, 2024
            Buffalo, New York